UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

___

KRISTOPHER TORGERSON,

    **Plaintiff,**

v.                                                                         Case No. 20-cv-1297

B. RASMUSSEN,

    **Defendant.**

___

## DECISION AND ORDER

Plaintiff Kristopher Torgerson, who is currently confined at Waupun Correctional Institution (Waupun) and representing himself, brings this lawsuit under 42 U.S.C. § 1983. (ECF No. 1.) Torgerson was allowed to proceed on an Eighth Amendment claim against defendant B. Rasmussen for allegedly sexually assaulting him. Rasmussen filed a motion for summary judgment. (ECF No. 42.) The motion is fully briefed and ready for a decision. The parties have consented to magistrate judge jurisdiction. (ECF Nos. 7. 13.) For the reasons stated below, the court grants Rasmussen's motion for summary judgment.

### FACTS

*The Parties' Encounters in September and October 2018*

From August 15, 2018, to October 29, 2018, plaintiff Kristopher Torgerson was housed in cell 46 in the Northwest Cell Hall at Waupun. (ECF No. 65, ¶ 2.) Defendant

B. Rasmussen worked at Waupun from September 10, 2018, to November 20, 2018. (*Id.*, ¶ 3.) On November 20, 2018, Rasmussen voluntarily resigned her position at Waupun. (*Id.*) Rasmussen states that for her first three weeks on the job (through September 29, 2018), she was training with another Waupun staff member, so she was never alone with a prisoner. (*Id.*, ¶ 5.) Torgerson states that Rasmussen was alone with him, but does not provide dates, times or other details. (*Id.*)

At some point in September, Torgerson states that he believed "Rasmussen was into him" because she made eye contact with him while training. (*Id.*, ¶ 6.) Torgerson would blow kisses at Rasmussen, and Rasmussen did not say anything or tell him to stop, so Torgerson "took Rasmussen's silence as a sign that he should take more initiative." (*Id.*, ¶¶ 7-8.)

On September 30, 2018, Rasmussen began working solo assigned posts, usually on second shift. (*Id.*, ¶ 9.) Rasmussen worked in the Northwest Cell Hall as a support officer on September 30, October 1, October 9, October 10, October 18, October 27, October 28, and October 29, 2018. (*Id.*, ¶ 10.) Rasmussen states that during her shifts, she was friendly towards the prisoners and would stop at their cells to have "cordial conversations" with them. (*Id.*, ¶ 12.) She denies flirting with any prisoner. (*Id.*, ¶ 14.) She also denies ever sharing personal information with any prisoner, but Torgerson asserts that she told him she had a tattoo and that she was not in a relationship. (*Id,* ¶ 14; at 29, ¶ 3.)

It is undisputed on October 9, 2018, "Torgerson grabbed Rasmussen by the arm, kissed her neck, and slid his hand down her butt." (*Id.*, ¶ 15.) Rasmussen states

2

that she did not give Torgerson permission to touch her. (*Id.*, ¶ 16.) Torgerson acknowledges he did not have verbal permission, but "believed he had permission from Rasmussen to touch her based on her demeanor with him previously." (*Id.*) After Torgerson touched her, Rasmussen asserts she told him to get off of her and pushed him away. (*Id.*, ¶ 17.) Torgerson states Rasmussen did not say anything to him. (*Id.*)

On October 10, 2018, it is undisputed that Torgerson put a note in Rasmussen's pocket that said, "Sexy lady." (*Id.*, ¶ 18.) Rasmussen states she immediately gave the note back to Torgerson, which Torgerson disputes. (*Id.*, ¶ 19.) Then, on October 18, 2018, it is undisputed that Torgerson attempted to make Rasmussen look at him while he masturbated in his cell. (*Id.*, ¶ 20.) Rasmussen states she told him no and gave him a direct order to stop whereas Torgerson denies that Rasmussen said this. (*Id.*, ¶ 21.) It is also undisputed that Torgerson wrote "rub ass" and "kiss" on his calendar on the date of October 18, 2018. (*Id.*, ¶ 22.) On October 27, 2018, it is undisputed that Torgerson told Rasmussen he had gotten a tattoo with the initials "KB" to represent their first names. (*Id.*, ¶ 23.)

At that point, Rasmussen started avoiding Torgerson because she believed Torgerson "had become obsessed with her". (*Id.*, ¶ 24.) After ignoring him for a few days, on October 29, 2018, Rasmussen states that Torgerson left his assigned area to find Rasmussen, yell at her, and threaten her. (*Id.*, ¶ 25.) Rasmussen states that Torgerson yelled "I'm going to fuck you!" and Rasmussen then threatened him with a conduct report. (*Id.*, ¶ 26.) Torgerson then became angry, telling Rasmussen he was a gang member and that "there would be consequences if Rasmussen did not do what

he wanted." (*Id.*) Torgerson also called Rasmussen "bipolar" and "crazy." (*Id.*, ¶ 27.) Torgerson admits that he left his assigned area but denies that he yelled at or threatened Rasmussen. (*Id.*, ¶¶ 25-27.)

After this encounter, Rasmussen reported all of Torgerson's prior sexual advances and sexual comments to her supervisor, Sergeant Bouzak. (*Id.*, ¶¶ 28-29.) Rasmussen admits that she should have reported the encounters earlier, but as a new employee she "was scared and felt uncomfortable reporting this to a supervisor." (*Id.*, ¶ 30.) Sergeant Bouzak advised Rasmussen to document all her interactions with Torgerson in an email, which she did. (*Id.*, ¶ 29; ECF No. 45-2.)

*Investigation of the Parties' Encounters*

After Rasmussen reported her encounters with Torgerson to Sergeant Bouzak, Torgerson was transferred to temporary lock up (TLU) in the Restrictive Housing Unit (RHU) while Rasmussen's claims were investigated. (ECF No. 65, ¶ 32.) Captain Radtke was assigned to investigate. (*Id.*, ¶ 33.) At some point shortly after Rasmussen disclosed her encounters with Torgerson, Torgerson claimed that Rasmussen sexually assaulted him. (*Id.*, ¶ 32.) Radtke was then also assigned to investigate Torgerson's claims pursuant to the Prison Rape Elimination Act (PREA). (*Id.*, ¶ 33.)

On October 31, 2018, Radtke and Dodge County Detective Stiemsma interviewed Torgerson as part of the PREA investigation. (*Id.*, ¶ 34.) Torgerson stated that on October 18, 2018, Rasmussen gave him oral sex. (ECF No. 47-1 at 27-28.) According to Torgerson, he wedged himself between his bunk and the cell bars, "got on his bed" and stuck his penis in between the bars. (*Id.*) Rasmussen then performed

4

the act while standing, which lasted a "minute or two." (*Id.*) Rasmussen alleges that Torgerson stated to Radtke and Stiemsma that "he sat on the top bunk with his underwear down and stuck his penis through the bars." (ECF No. 44, ¶ 35.) Rasmussen then notes that performing the act the way Torgerson describes is seemingly impossible. (*Id*, ¶ 36.) There is only nine inches of space between the bunk and the cell bars, and the bunk is bolted to the floor, so it could not move. (*Id.*, ¶¶ 38-39.) If Torgerson was sitting on the bed like he claimed, there is no way for him to extend through the grate in his cell.

Torgerson now says he wasn't sitting on the top bunk but was standing while wedged between the bunk and the grate. He submitted a drawing depicting how the act was accomplished. (ECF No. 66-1 at 26.) In series of photo exhibits of his cell, Torgerson explains that he positioned his right hand on the corner of the bunk to prop himself up and wedge himself in between the bunk and the bed. (*Id.* at 22-25.) He then placed his feet at the bottom of the cell gate to support himself and inserted his penis through a square in the cell grate. (*Id.*, at 26.)

After the act was completed, Rasmussen walked away, and Torgerson, "just layed [*sic*] on my bed. I was happy. Pleased. In a world of shock really." (ECF No. 47-1 at 31.) He also stated that he "wanted to savor the moment." (*Id.* at 32.)

After interviewing Torgerson, and examining his cell, Radtke and Stiemsma concluded that Torgerson's allegations were physically impossible. (ECF No. 65, ¶ 36.) First, they did not think it was physically possible to receive oral sex the way Torgerson described because of the dimensions of the cell and the size of the cell grate.

5

(*Id.*, ¶¶ 37-40.) Second, the cell hall was a busy place, and they determined that it would be impossible for the act to occur without someone witnessing it. (*Id.*, ¶ 41.) Third, they made a credibility determination and found that Torgerson's accounts were riddled with inconsistencies. (*Id.*, ¶ 43.) For instance, Torgerson said his cell mate, Khalif Love, knew about his relationship with Rasmussen, but when Radtke interviewed Love twice, both times he denied witnessing any inappropriate actions between Torgerson and Rasmussen. (*Id.*, ¶¶ 44-45.) Fourth, Rasmussen denied that the encounter on October 18, 2022, took place. (*Id.*, ¶ 47.)

As a result of the investigation, on November 9, 2018, Torgerson was informed he would be receiving conduct report for engaging in unwanted sexual contact with Rasmussen and for making false statements about Rasmussen. (*Id.*, ¶¶ 49-50.) On November 16, 2018, Radtke issued Torgerson the conduct report. (*Id.*, ¶ 54.)

Prior to receiving the conduct report, on November 11, 2018, Torgerson wrote Radtke the following:

> Ms. Radtke, "I have some requests that I'm sure you can make happen." (1) Get my legal work from Jerry. (2) Conduct Report for sexual conduct & soliciting an employee (60 days DS). (3) Permanent housing in the south cell hall/high side/E-tier only. (4) Officer Rasmussen be able to keep her job/somewhere? (5) 6 pair boxers returned/ & September & October Calendars returned. (I make the statement when you have me sign the conduct report) *Face/to Face* Personally agree.

(ECF No. 47-1 at 67). Radtke states that this communication was Torgerson's offer to recant his allegations against Rasmussen if she agreed to his five demands. (ECF No. 65, ¶ 55.) To Radtke, this was further confirmation that Torgerson fabricated his

6

allegations against Rasmussen, and in her experience, "it was not uncommon" for Torgerson to fabricate allegations to avoid punishment. (*Id.*, ¶¶ 56-57.)

At Torgerson's conduct hearing, Captain Westra determined that it was more likely than not that Torgerson committed sexual assault against Rasmussen, solicited her, and fabricated the October 18, 2022, incident of oral sex. (*Id.*, ¶ 60). Westra made his decision in part because Torgerson testified at the hearing that he believed he had a consensual sexual relationship with Rasmussen. (ECF No. 44., ¶ 62.) However, Westra found that Torgerson was not credible, that Rasmussen did not consent to a relationship with Torgerson, and that the alleged oral sex probably did not occur. (*Id*, ¶ 63.) As such, Westra affirmed the conduct report. (*Id.*)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

7

(1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment a party cannot just rely on his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Servs., Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Torgerson claims that Rasmussen violated his Eighth Amendment rights when she performed oral sex on him on October 18, 2018. In her brief in support of her motion, Rasmussen points out that in its screening order, the court did not specify the Eighth Amendment standard under which Torgerson's claims should be analyzed. (ECF No. 43 at 11.) The court also recognizes that the Seventh Circuit Court of Appeals has yet to firmly decide which standard applies in sexual assault cases. In its most recent case addressing alleged sexual assault committed by a prison official against a prisoner, which was decided in the context of reviewing jury instructions (not in the context of summary judgment), the Seventh Circuit states that "[t]o establish that [the defendant's] conduct violated [the plaintiffs'] Eighth Amendment rights, [the plaintiffs] had to prove that [the defendant] acted with deliberate

8

indifference to an excessive risk to their health and safety." *JKJ v. Polk County*, 960 F.3d 367, 376 (7th Cir. 2020). Because *JKJ* seemingly indicates the standard the Seventh Circuit has deemed appropriate for analyzing sexual assault cases, the court will apply that deliberate indifference standard in Torgerson's case.

The Eighth Amendment "protects prisoners from prison conditions that cause 'the wanton and unnecessary infliction of pain.'" *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). As such, "[a] § 1983 claim based upon a violation of the Eighth Amendment has both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the individual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006).

Rasmussen argues that Torgerson's claim against her should be dismissed because no reasonable factfinder could conclude that the alleged oral sex actually occurred. According to Rasmussen, as the pictures of Torgerson's cell demonstrate, it would be physically impossible. (ECF No. 46-3.) However, the photos submitted do not conclusively establish that Torgerson's claim would have been impossible. It remains a factual dispute unresolvable at this stage of the proceedings.

However, this question of fact is not material because no reasonable jury could conclude that Torgerson's constitutional rights were violated. Even when taking the facts in a light most favorable to Torgerson and assuming that the oral sex occurred, nothing about Torgerson's situation indicates that he was subjected to a "wanton and

9

unnecessary infliction of pain". Torgerson argues that his actions and reactions are irrelevant because, as a prisoner, he categorically lacks the ability to consent to sex with a correctional officer, so the act is an automatic violation of his Eighth Amendment rights. (ECF No. 63 at 13.) In support of his argument, Torgerson cites Wis. Stat. § 940.225(2)(h) which makes the sexual assault of an inmate a Class C felony under Wisconsin law. He also cites *State v. Blum*, 344 Wis. 2d 297, 2012 WI APP 106, ¶ 16 (Wis. Ct. App. 2012) (unpublished) for the proposition that a prisoner cannot consent to sex with a correctional officer. Both the statute and the case Torgerson cite do not apply to federal § 1983 cases, but only to criminal prosecutions in the State of Wisconsin.

The Seventh Circuit has not clearly ruled on a prisoner's ability to consent and whether consent can be a defense to an Eighth Amendment claim. *JKJ v. Polk County* seems to suggest that the Seventh Circuit contemplates consent as a defense in a § 1983 suit. In *JKJ*, the Seventh Circuit considered whether the defendant's verdict should be reversed because the district court failed to give the jury a specific special instruction on whether the plaintiffs consented to the sexual contact. *JKJ*, 960 F.3d at 376. While the Seventh Circuit found that a special instruction was unnecessary, it did conclude that the jury was allowed to consider whether the plaintiffs consented when finding the defendant liable under a deliberate indifference standard. *Id.* Thus, there does not appear to an outright bar in § 1983 cases to raising the issue of consent to defeat a claim.

10

In addition, while other courts within the Seventh Circuit have acknowledged that a prisoner is legally incapable of consent, these cases are distinguishable. For example, in *Jessie v. Wouts*, Case No. 17-cv-840, 2019 WL 403711 at *2, (W.D. Wis. Jan. 31, 2019), Judge James D. Peterson, in ruling on a motion for default judgment, found that even though the sexual encounters between the prisoner plaintiff and the correctional officer defendant were "consensual at first", the plaintiff's consent ultimately was irrelevant because the plaintiff's prisoner status made him legally incapable of consenting. Notably, Judge Peterson does not provide a citation supporting this finding. Perhaps the reason for this is because in *Jessie*, over fifty instances of sexual contact were alleged, and "[a]s time went on, the sexual contact with [the defendant] was increasingly coercive," to the point where the plaintiff experienced increasing fear and anxiety, ultimately causing him to attempt suicide. *Id.*

Other courts have noted that "there is no consensus in the federal courts on whether, or to what extent, consent is a defense to an Eighth Amendment claim based on sexual contact with a prisoner." *Graham v. Sheriff of Logan Cnty.*, 741 F.3d 1118, 1125 (10th Cir. 2013). In *Graham*, the Tenth Circuit decided to treat the claim as a kind of excessive force claim that required coercion as an element. Finding "overwhelming evidence of consent," the court affirmed the district court's grant of summary judgment to the defendant. *Id.* at 1126.

Here, there is no evidence that Torgerson experienced any sort of distress like the plaintiff in *Jessie*, and in fact, Torgerson's own evidence demonstrates that

11

instead of pain, substantial harm, or cruel and unusual punishment, he experienced quite the opposite. After the oral sex occurred, Torgerson described how happy he felt and how he wanted to "savor the moment." (ECF NO. 47-1 at 31-32.) It is also undisputed that in the weeks leading up to the incident, he aggressively pursued Rasmussen's sexual favors—kissing her, groping her, and making overt sexual overtures to her. Even after the alleged incident, he continued to pursue her, showing her the tattoo he got combining their first initials and confronting her when she ignored him. By his own version of the facts, then, Torgerson not only consented to sexual contact with Rasmussen, but actively sought it out. However inappropriate the conduct alleged would be (if true), it cannot sensibly be categorized as "punishment."

In light of all of these facts, which are largely undisputed or provided by Torgerson himself, it is clear that no reasonable factfinder could conclude that Torgerson was subjected to a substantial harm rising to the level of a constitutional violation by receiving oral sex from Rasmussen. Summary judgment is therefore granted in Rasmussen's favor.

## CONCLUSION

For the foregoing reasons, the Rasmussen's motion for summary judgment is granted. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED** that Rasmussen's motion for summary judgment (ECF No. 42) is **GRANTED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED**. The Clerk of Court will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rules of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 28th day of September, 2022.

STEPHEN C. DRIES
United States Magistrate Judge